## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **STEPHANIE TARAPCHAK** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 15-2078** |
| | : | |
| **LACKAWANNA COUNTY,** *et al.* | : | |

**KEARNEY, J.**                                                   **November 10, 2016**

## MEMORANDUM

Exercising discretion, Lackawanna County judges often allow arrested persons to prepare for trial under an established House Arrest Program enforced by electronic monitoring.   When the electronic monitor reports the arrested person left her home, we expect the County will review probable cause before placing her back in prison for an extended time.   The person on house arrest has a liberty interest and, in taking it away, the County must ensure due process in the arrest, the preliminary hearing on probable cause, and the final judicial hearing to determine whether the person violated house arrest conditions.   As we learned in discovery, however, the director of Lackawanna County's House Arrest Program admits, subject to jury evaluation, to a House Arrest custom "in all cases" through which he both automatically returns the person to prison and then later travels to the prison to conduct the preliminary "formal misconduct hearing" to determine the circumstances leading to her return to prison.   Sometime shortly thereafter, the County judge holds a final revocation hearing on the Commonwealth's motion to revoke bail.

Today we address disputed facts regarding Lackawanna County's and its House Arrest Program Director's liability for depriving liberty interests of a house arrest defendant without procedural due process during the preliminary "formal misconduct hearing."   On a summary

judgment record, it appears the Director acted as both prosecutor and judge in the preliminary

"formal misconduct hearing" resulting in the plaintiff remaining in custody for over two weeks

before she saw a judicial officer. As no caselaw defined a clearly established liberty interest for a

person awaiting trial on house arrest, the Director enjoys qualified immunity and is dismissed.

We need a jury to  determine the disputed facts surrounding liability and damages arising from

Lackawanna County's admitted custom "in all cases" allowing its Director to arrest, imprison

and then hold a "formal misconduct hearing" in prison.

## I.    Facts in the light most favorable to Ms. Tarapchak.[1]

After a twelve-month investigation, the grand jury returned an indictment for multiple

felony and misdemeanor charges against Stephanie Tarapchak, resulting in her arrest.[2]  At her

January 2, 2014 bail hearing, County Judge Gallagher set bail at $100,000.[3]  As Ms. Tarapchak

could not post bail, authorities placed her in pretrial confinement at Lackawanna County Prison.[4]

On May 5, 2014, County Judge Geroulo reduced bail to $25,000 and, allowed Ms. Tarapchak's

release to home confinement with electronic monitoring after posting a 10% bond.[5]

### An undocketed Order serves as a bench warrant for future violations.

Judge Geroulo's May 5, 2014 Order directed Ms. Tarapchak participate in the

Lackawanna County House Arrest Program.[6]  The parties claim the May 5, 2014 Order is not

docketed, and our review does not confirm whether anyone ever docketed the May 5, 2014

Order.[7]

The May 5, 2014 Order purported to serve as a "temporary bench warrant" to arrest Ms.

Tarapchak for future bail violations without a new showing of probable cause: "This Order will

serve as a temporary Bench Warrant until Formal Charges for Escape are filed by the County

District Attorney's Office."[8]  Although the May 5, 2014 Order purported to be a temporary bench

warrant, it simultaneously informed Ms. Tarapchak a bench warrant would be issued for her arrest at any time in the future if she violated conditions of the House Arrest Program: "[I]f you fail to abide by all conditions . . . or fail to return to official detention, a Bench Warrant will be issued for your arrest."[9]   The May 5, 2014 Order did not require a separate probable cause finding before issuing a bench warrant.

### *Patrick Lynn, long-time Director of the County's House Arrest Program, is responsible for conducting the preliminary misconduct hearings.*

Patrick Lynn is the Director of the Lackawanna County House Arrest Program.[10]   He served in this role since 2001.[11]   Director Lynn describes his three responsibilities: he reviews and enforces court orders directing pretrial detainees or convicted persons to participate in the House Arrest Program;[12]  he timely notifies the prosecuting agency and judge who entered the house arrest order of when he or his staff revokes home confinement status;[13] and,  Director Lynn conducts the preliminary formal misconduct hearing to "determine the circumstances as to why the individual violated the terms of" the House Arrest Program.[14]

The County maintains a policy for conducting formal misconduct hearings upon learning a house arrest detainee allegedly violated a condition of the House Arrest Program.[15]   Under the County policy, program staff must inform the alleged violator of the charge(s) against him and the potential punishment either verbally or in writing.[16]   The alleged violator must receive notice of the hearing.[17]   The alleged violator is permitted to submit statements or evidence.[18]   The hearing must take place before an "impartial panel consisting of the Prison Security, Counseling, Home Detention, and/or Work Release Staff."[19]   The panel decides by majority vote whether the violator is guilty or innocent of misconduct.[20]   The final determination must be in writing, and there is no right to appeal.[21]

Director Lynn conducted formal misconduct hearings since 2001.[22]   Four other

3

employees of the House Arrest Program also conduct these hearings.[23]  Director Lynn testified he holds several misconduct hearings each week.[24]  In 2014 and 2015, he conducted 102 and 92 misconduct hearings, respectively.[25]  He and his staff conduct hundreds of these hearings each year.[26]  We have no direct evidence about the substance of any of these misconduct hearings.

Director Lynn did not undergo any training on how to conduct formal misconduct hearings.[27]  His training as an employee of the House Arrest Program consists of "20 years experience."[28]

Director Lynn swears he lacks discretion to offer leniency to participants of the Home Arrest Program.[29]  If an individual violates a condition of the House Arrest Program, he must revoke home confinement status and return the individual to Lackawanna County Prison.[30]

Although Director Lynn is responsible for conducting formal misconduct hearings, he is not responsible for scheduling a final bail revocation hearing before a judge.[31]  The judges of the Court of Common Pleas schedule bail revocation hearings.[32]

### The conditions of Ms. Tarapchak's home confinement under the House Arrest Program.

Although Ms. Tarapchak agreed to many restrictive conditions as part of her agreement to participate in the House Arrest Program, she enjoyed freedoms not available in prison.  Ms. Tarapchak could leave her home to report to her place of employment or other locations, but only if she did so to authorized locations within designated times.[33]  She could not possess or use weapons, alcohol, or certain telephonic devices, but she could make phone calls for up to fifteen minutes at a time.[34]  Authorities could strip search her at any time, search her home or vehicle, or submit her to drug and alcohol testing.[35] Authorities could also demand she report to the House Arrest Program office at any time, and required her to report any employment changes.[36]  The conditions, however, did not specifically prevent Ms. Tarapchak from receiving family and

4

friends as house guests.[37]

### Ms. Tarapchak admits violating a condition of the House Arrest Program.

From May through September 2014, Ms. Tarapchak remained in the House Arrest Program without incident.[38]  On October 22, 2014, Ms. Tarapchak violated a condition of home confinement because she admittedly went behind the garage to argue with her boyfriend.[39]

After learning of Ms. Tarapchak's violation from the electronic monitoring, Director Lynn requested she report to his office to explain her whereabouts.[40]  She reported and described having a panic attack and going outside behind her garage.[41]

While in his office with Ms. Tarapchak, Director Lynn called the Office of the Attorney General, the prosecuting agency in Ms. Tarapchak's case, and reported the violation.[42]  The Attorney General's office told Director Lynn to return her to Lackawanna County Prison because, in its judgment, she violated the May 5, 2014 Order.[43]  According to Director Lynn, he revoked Tarapchak's House Arrest Program status and returned her to prison under the authority of the "temporary bench warrant" in the May 5, 2014 Order.[44]

The next day, October 23, 2014, Director Lynn faxed a letter to the Senior Deputy Attorney General Mark Bellavia advising Ms. Tarapchak had been taken back into custody.[45]  The following day, the Commonwealth filed a motion to revoke Ms. Tarapchak's bail.[46]  It appears from the record no one found probable cause.

### Director Lynn conducts the formal misconduct hearing
### and sends the results to the judge four days later.

On October 24, 2014, Director Lynn then acted as judge by conducting a formal misconduct preliminary hearing with Ms. Tarapchak at the Lackawanna County Prison.[47]  According to Ms. Tarapchak, a guard came to her prison cell and told her Director Lynn wanted to talk to her.[48]  Ms. Tarapchak did not know why Director Lynn wanted to speak with her.[49]  Ms.

Tarapchak refused to talk to Director Lynn at the hearing without her attorney present.[50]  There is no indication Ms. Tarapchak received prior notice of this hearing or had the opportunity to offer evidence.

The next business day, Director Lynn advised Judge Geroulo Ms. Tarapchak had been taken back into custody.[51]   Director Lynn described conducting a formal misconduct hearing on October 24, 2014.[52]   Director Lynn submitted "conclusions and recommendations" to Judge Geroulo: 1) Tarapchak "refused to participate in Misconduct Hearing"; 2) she violated the House Arrest Program rules and regulations; 3) Tarapchak's "termination from the Program was warranted & justified"; and 4) Tarapchak should remain incarcerated at Lackawanna County Prison.[53]

### Ms. Tarapchak's final bail revocation hearing is held 15 days later, but is continued at the request of Tarapchak's attorney.

On November 7, 2014, fifteen days after Director Lynn returned Ms. Tarapchak to prison, Judge Geroulo held a bail revocation hearing.[54]  At the hearing, Judge Geroulo did not rule on the Commonwealth's motion to revoke bail.  Instead, Judge Geroulo continued the hearing at the request of Ms. Tarapchak's attorney, Joseph Kalinowski, so Attorney Kalinowski could file a motion to recuse Judge Geroulo.[55]   Before granting the motion, Judge Geroulo explained granting a continuance would mean Ms. Tarapchak must remain in jail, to which Attorney Kalinowski responded, "She understands that."[56]  At her deposition, however, Ms. Tarapchak explained she wanted to have a hearing on her bail violation that day, but not in front of Judge Geroulo because he had a conflict of interest.[57]

The docket does not indicate whether a judge ever ruled on the Commonwealth's October 2014 motion to revoke bail.  Ms. Tarapchak remained in prison for the remainder of her pretrial proceedings.

On October 27, 2015, Tarapchak, acting *pro se*, sued the County, Director Lynn, and eight other defendants for allegedly violating her constitutional rights under 42 U.S.C. § 1983.[58]  We granted Defendants' motions to dismiss Tarapchak's Second Amended Complaint in part, dismissing all claims against the eight defendants.  We denied Director Lynn's motion as to Ms. Tarapchak's due process claim against him relating to scheduling the final bail revocation hearing and holding the formal misconduct hearing.  We also denied the County's motion as to Ms. Tarapchak's municipal liability claim against the County.[59]

## II.    Analysis

Director Lynn and the County move for summary judgment.[60]  Director Lynn argues he is not responsible for scheduling a bail revocation hearing before a judge, and he is otherwise protected by qualified immunity.  The County argues Tarapchak does not have a liberty interest in remaining in home confinement.  The County also argues Tarapchak did not prove the existence of a policy or custom or it failed to train Director Lynn.

We find Ms. Tarapchak has a liberty interest in home confinement, triggering certain minimal due process requirements.  The County did not meet these due process requirements.  Notwithstanding these several deficiencies, Director Lynn is entitled to qualified immunity because this liberty interest is not clearly established by pre-existing case law.  Ms. Tarapchak nonetheless demonstrates a § 1983 claim for municipal liability based on the County's unlawful custom and failing to train Director Lynn.

### A. Ms. Tarapchak has a liberty interest in home confinement as a bailee.

Ms. Tarapchak, as a bailee, has a liberty interest in home confinement under the Due Process Clause of the Fourteenth Amendment.  "The Fourteenth Amendment prohibits state actors from depriving persons 'of life, liberty or property without due process of law.'"[61]

"Whether any procedural protections are due depends on the extent to which an individual will be 'condemned to suffer grievous loss.'"[62] We consider "whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment."[63]

Whether a bailee has a liberty interest in home confinement has not been addressed by the Supreme Court or our Court of Appeals, but the Supreme Court in *Morrissey v. Brewer* found a liberty interest in an analogous situation involving a parole termination.[64] In *Morrissey*, the Court explained a parolee's liberty while on parole includes many "core values of unqualified liberty."[65] A parolee can obtain employment, spend time with family and friends, and form "other enduring attachments of normal life."[66] The termination of this liberty "inflicts a 'grievous loss' on the parolee and often on others."[67]

The Court came to this conclusion even though it acknowledged many conditions restricting a parolee's liberty "substantially beyond the ordinary restrictions imposed by law on an individual citizen."[68] For example, a parolee must seek permission "before engaging in specified activities, such as changing employment or living quarters, marrying, acquiring or operating a motor vehicle, traveling outside the community, and incurring substantial indebtedness."[69] Additionally, a parolee must "regularly report" to his parole officer.[70] And typically, a parolee cannot use alcohol and cannot affiliate or communicate "with certain categories of undesirable persons."[71] Although the government subjects a parolee "to many restrictions not applicable to other citizens," the Court found a parolee's status "very different from that of confinement in a prison."[72]

The due process "grievous loss" analysis for parolees in *Morrissey* remains the applicable standard in the context of revoking a convicted defendant's parole. Almost twenty-five years after *Morrissey*, the Supreme Court in *Young v. Harper* concluded an Oklahoma pre-parole

program "was sufficiently like parole that a person in the program was entitled to the procedural protections set forth in *Morrissey*."[73] Because an Oklahoma pre-parolee lived under virtually the same restrictions as the person on parole in *Morrissey*, the nature of a pre-parolee's interest in remaining on pre-parole mirrored the "nature of the interest of the parolee in his continued liberty."[74] The Court did not "revisit *Morrissey*" or its due process analysis of a parolee's interest in remaining on parole.[75]

Following *Morrissey*, at least one district court found the revocation of bail implicated the bailee's liberty interest, although the bailee had not been restricted to home confinement.[76] In *Wall v. Dauphin County*, Chief Judge Kane concluded, "[t]here can be little argument that one's interest in remaining free on bail is within the contemplation of the liberty or property language of the Fourteenth Amendment."[77]   Revoking one's bail "condemns one to 'suffer grievous loss' because it 'may imperil the suspect's job, interrupt his source of income, and impair his family relationships."[78]

We similarly conclude Ms. Tarapchak's interest in remaining free on bail, albeit in home confinement, falls within the contemplation of the liberty language of the Fourteenth Amendment.   Her home confinement retains many "core values of unqualified liberty" applicable to all citizens.[79]  Ms. Tarapchak could obtain employment, accept friends and family as guests in her home, and form "other enduring attachments of normal life."[80]  Terminating this liberty "inflicts a 'grievous loss' on" Ms. Tarapchak.[81]   Although Ms. Tarapchak's liberty is curtailed significantly compared to a free citizen, she enjoys substantially more liberty in home confinement than in prison.

Concluding Ms. Tarapchak has a liberty interest entitling her to due process under *Morrissey* is also consistent with Supreme Court cases finding, by way of comparison, no liberty

interest when challenging conditions of pretrial and post-trial confinement.  For example, in *Bell v. Wolfish*, the Supreme Court explained the due process rights afforded to pretrial detainees in prison confinement requires an inquiry into whether the conditions of a pretrial detainee's confinement "amount to punishment of the detainee."[82]  The due process clause prohibits the government from punishing a detainee "prior to an adjudication of guilt in accordance with due process of law."[83]  This rule does not apply to Ms. Tarapchak because she is a bailee, not a pretrial detainee in prison.  In *Sandin v. Connor*, the Supreme Court held the disciplinary confinement of a convicted inmate in a special housing unit did not implicate any liberty interests.[84]   In *Sandin*, the Court trimmed back an outgrowth of prisoner rights cases where prisoners grounded their liberty interests in mandatory language found in prison regulations.[85]  The Court explained this outgrowth of regulation-based due process inquiry had two undesirable effects: 1) disincentivizing states from adopting uniform prison regulations; and 2) increasing day-to-day involvement of the courts in prison management, "often squandering judicial resources with little offsetting benefit to anyone."[86]  The Court acknowledged states may create liberty interests for prisoners "under certain circumstances," but these interests are "generally limited to freedom from restraint" which "impose atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."[87] The Court concluded Connor's disciplinary confinement to the special housing unit "did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest."[88]   The Court distinguished *Bell*, explaining "*Bell* dealt with the interests of pretrial detainees and not convicted prisoners."[89]  "The Court in *Bell* correctly noted that a detainee 'may not be punished prior to an adjudication of guilt in accordance with due process of law.'"[90] The Court in *Bell* expressed concern a state might punish a detainee for the indicted crime by means of

preconviction holding conditions.[91]  Permitting such punishment "would improperly extend the legitimate reasons for which such persons are detained—to ensure their presence at trial."[92] Unlike government punishment of pretrial detainees, government punishment of convicted inmates serves legitimate goals: prison management and prisoner rehabilitation.[93] Again, the rule in *Sandin* does not apply to Ms. Tarapchak because she is a bailee, not a convicted inmate.  The legitimate government interests permitting punishment of convicted inmates—prison management and prisoner rehabilitation—do not apply in the context of an unconvicted bailee.

We conclude Ms. Tarapchak has a liberty interest in continued home confinement.  In removing her from home confinement, the County deprived Ms. Tarapchak of her liberty, triggering due process requirements.  We now turn to the process due to Ms. Tarapchak.

### B. Due Process requires a preliminary impartial hearing, notice of the hearing, and the right to present evidence at the hearing, followed by a final bail revocation hearing within a reasonable period of time.

As the Supreme Court mandated in *Morrissey,* due process for a bail violation requires both a preliminary hearing to determine probable cause or reasonable grounds followed by a hearing before a judicial officer.   The issue today is the due process afforded during the preliminary hearing, characterized by the County as the "formal misconduct hearing."

Although the County afforded Ms. Tarapchak some process following her detention for violating a bail condition, this process failed to adequately protect the nature of her deprivation. The Due Process Clause is "flexible and calls for such procedural protections as the particular situation demands."[94]  When determining the procedures demanded by due process, we must consider the three *Mathews* factors: 1) "the private interest affected by the official action;" 2) "the risk of an erroneous deprivation of that interest through the procedures used, as well as the probable value of additional safeguards;" and 3) "the Government's interest, including the

administrative burden that additional procedural requirements would impose."[95]

Neither the Supreme Court nor our Court of Appeals have described the process due when the government remands a bailee to prison for a bail condition violation. Nonetheless, even in the context of the analogous situation of parolees, due process requires "some informal procedural guarantees" if the government revokes parole.[96]

In *Morrissey*, which preceded *Mathews*, the Court concluded due process required procedural protections when revoking parole. The Court held a parolee's liberty while on parole includes many "core values of unqualified liberty."[97] A parolee can obtain employment, spend time with family and friends, and form "other enduring attachments of normal life."[98] "Though the State properly subjects him to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison."[99] "The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions."[100] The parolee may face "lengthy incarceration if his parole is revoked."[101] Based on the nature of this liberty interest alone, its termination "calls for some orderly process, however informal."[102]

The Court also found the state had several related interests in revoking parole. Because the state found the parolee guilty of a crime, it may impose "extensive restrictions on the [parolee's] liberty."[103] Given the parolee's conviction and the legitimate parole conditions imposed upon him, "the State has an overwhelming interest" in returning a violating parolee to prison "without the burden of a new adversary criminal trial."[104]

The state, however, "has no interest in revoking parole without some informal procedural guarantees."[105] As a parolee is not in "actual custody," the reasons favoring summary treatment of prisoners—including prison management—do not apply.[106] A parole revocation decision,

while discretionary, can be resolved in a "simple factual hearing" without imposing an undue administrative burden on the government.[107]

Weighing the competing state and individual interests, the Court determined after a parolee is arrested, due process requires a preliminary hearing with "some minimal inquiry ... conducted . . . as promptly as convenient . . . while information is fresh and sources are available."[108] This "preliminary hearing" should be held to "determine whether there is probable cause or reasonable ground to believe" the parolee violated a condition of parole.[109] The County provides this due process through a "formal misconduct hearing" in prison.

Supreme Court guidance confirms due process requires five additional limitations regarding the preliminary hearing. First, the probable cause determination "should be made by someone not directly involved in the case," although not necessarily a "judicial officer."[110] This is because "[t]he officer directly involved in making recommendations cannot always have complete objectivity in evaluating them."[111] Second, the parolee must be given notice of the hearing and of the alleged violations.[112] Third, the parolee may bring to the hearing "letters, documents, or individuals who can give relevant information to the hearing officer."[113] Fourth, the parolee may request the attendance of the person accusing him of the violation, although that person cannot be confronted or cross examined if disclosing his identity would pose a risk of harm.[114] Fifth, the hearing officer must prepare a summary of the hearing and determine "whether there is probable cause to hold the parolee for the final decision of the parole board on revocation."[115]

Due process also requires a later final revocation hearing before a judicial officer, where there is "final evaluation of any contested relevant facts and consideration of whether the facts as determined warrant revocation."[116] "The parolee must have an opportunity to be heard and to

show . . . he did not violate the conditions."[117]  Even if the parolee did violate a parole condition, due process requires he have the opportunity to show "circumstances in mitigation" suggesting "the violation does not warrant revocation."[118]  The final revocation hearing must occur "within a reasonable time after the parolee is taken into custody."[119]  Judge Braxton afforded this hearing within fifteen days of her violation.

Tarapchak's liberty interest in remaining on bail, albeit in home confinement, is analogous to the liberty interest of a parolee.  A bailee, like a parolee, can obtain employment, spend time with family and friends, and form "other enduring attachments of normal life."[120]  A bailee relies "on at least an implicit promise that [bail] will be revoked only if he fails to live up to the [bail] conditions," and the bailee may face "lengthy incarceration [i.e. pretrial confinement] if his [bail] is revoked."[121]  Based on the nature of a bailee's liberty interest alone, its termination "calls for some orderly process, however informal."[122]

The County has an interest in revoking Ms. Tarapchak's bail if she violates the House Arrest Program.  The County may justifiably detain an individual for a crime after a timely judicial determination of probable cause.[123]   While the County may impose "extensive restrictions on the [parolee's] liberty" because of the parolee's underlying conviction,[124] it may not impose similar restrictions on Ms. Tarapchak because she has not been convicted of a crime.  Given the probable cause determination justifying Ms. Tarapchak's pretrial detention and the legitimate bail conditions imposed on her, the County has a strong interest in returning her to prison for violating those conditions.

Given its interest, the County established a written policy.  The problem today is evidence, largely from Director Lynn's admissions, strongly suggesting the County did not follow its own policy regarding the preliminary hearings.  Under its policy, the County must

provide Ms. Tarapchak notice of the misconduct hearing.[125]   There is no evidence the County provided Ms. Tarapchak notice of her misconduct hearing.  She states she did not know why they wanted to talk with her.[126]   The County did not permit Ms. Tarapchak to submit statements or evidence.   There is no evidence the County notified Ms. Tarapchak of her right to proffer evidence, and there is a dispute of fact as to whether Ms. Tarapchak waived the opportunity to offer evidence by refusing to talk to Director Lynn at the hearing without her attorney present.[127]   The County's policy requires Ms. Tarapchak's hearing take place before an "impartial panel consisting of the Prison Security, Counseling, Home Detention, and/or Work Release Staff," who decides by majority vote whether the violator is guilty or innocent of misconduct.[128]   Ms. Tarapchak's hearing, however, occurred before two individuals, including Director Lynn, who is not impartial because he found she violated bail conditions in the first place.

Using *Morrissey* as a guidepost, there are three due process defects with Ms. Tarapchak's preliminary hearing.  First, there is no evidence Ms. Tarapchak received prior notice of this hearing.   Second, Ms. Tarapchak may not have had the opportunity to retrieve and proffer evidence.   Third, Director Lynn held the hearing even though he is not impartial.  *Morrissey* demands an independent decisionmaker, *i.e.*, someone "other than the one who has made the report of the [] violations or has recommended revocation."[129]

### *Ms. Tarapchak's remaining arguments regarding purported deficiencies in her bail revocation process.*

Although there are due process defects with Ms. Tarapchak's formal misconduct hearing, the County's several due process and statutory violations do not rise to a constitutional defect regarding the timing of her final bail revocation hearing before Judge Braxton.  In *Morrissey*, the Court held the revocation hearing must be held within a reasonable time after the parolee is taken into custody, but concluded "a lapse of two months" between the preliminary hearing and the

final revocation hearing "would not appear to be unreasonable."[130] Tarapchak's bail revocation hearing occurred within 15 days after authorities took her into custody, which does not appear to be unreasonable.[131]

Ms. Tarapchak argues she had the right to counsel at her formal misconduct hearing. The Sixth Amendment right to counsel attaches to "critical stages" of pretrial proceedings.[132] A stage is critical "where counsel's absence might derogate from the accused's right to a fair trial."[133] For example, a post-indictment lineup is a critical stage because counsel's presence "can often avert prejudice and assure a meaningful confrontation at trial."[134]

The formal misconduct hearing is not a critical stage because counsel's absence from this proceeding does not impair Ms. Tarapchak's right to a fair trial. The purpose of the formal misconduct hearing is to determine whether there is sufficient evidence for the County to detain Ms. Tarapchak for a bail violation. The lack of counsel's presence at this stage does not prejudice her rights at trial because the evidence at the formal misconduct hearing does not concern the same subject matter as the evidence used at trial.

Ms. Tarapchak also argues Director Lynn should have given her *Miranda* warnings, but this argument fails because she cannot seek redress for a *Miranda* violation in a civil action. "[A] *Miranda* violation is remedied by the suppression of evidence of any self-compelled incrimination, not a civil action."[135] "[V]iolations of the prophylactic *Miranda* procedures do not amount to violations of the Constitution itself."[136] "The right protected under the Fifth Amendment is the right not to be compelled to be a witness against oneself in a criminal prosecution, whereas the 'right to counsel' during custodial interrogation recognized in [*Miranda*], is merely a procedural safeguard, and not a substantive right."[137] Even assuming a *Miranda* violation occurred here, Ms. Tarapchak's only remedy is to suppress her statements at

trial.  She cannot shoehorn a *Miranda* violation into a § 1983 due process claim.

### C.  Director Lynn is entitled to qualified immunity.

Although Ms. Tarapchak has a liberty interest in home confinement triggering due process protections not afforded to her, Director Lynn is protected by qualified immunity.

A government official is entitled to qualified immunity if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[138]   A right is not clearly established "unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."[139]   In other words, the right must be "beyond debate" under existing precedent.[140]   We must not "define clearly established law at a high level of generality."[141]   Instead, we must consider the official's conduct within the "particular circumstances" he faced.[142]

Ms. Tarapchak fails to identify controlling case law holding a bailee has a liberty interest in home confinement.  Nor does she identify any analogous cases holding a government official liable for failing to ensure a bail revocation hearing is scheduled in a timely manner.  Our review of the case law reveals no cases establishing a bailee's liberty interest in home confinement or a right to a timely bail revocation hearing.  Director Lynn is entitled to qualified immunity.

### D.  We deny the County's motion on Ms. Tarapchak's claims for municipal liability under § 1983.

Ms. Tarapchak argues the County had a custom of holding unconstitutional formal misconduct preliminary hearings.  She also argues the County failed to train Director Lynn on: 1) how to hold constitutionally compliant formal misconduct hearings; 2) how to schedule timely bail revocation hearings; and, 3) how to distinguish between valid and invalid court orders.  We find, based principally on Director Lynn's admissions, there are genuine issues of material fact considering the County's de facto custom and failure to train.

17

*Custom of unconstitutional preliminary hearings.*

In *Monell*, the Supreme Court held a city may be liable under § 1983 when it causes the constitutional violation at issue.[143]   To succeed on her *Monell* claim, Ms. Tarapchak must establish: "(1) [she] possessed a constitutional right of which [she] was deprived; (2) the municipality had a policy [or custom]; (3) the policy [or custom] 'amounted to deliberate indifference' to [her] constitutional right; and (4) the policy [or custom] was the 'moving force behind the constitutional violation.'"[144]

Ms. Tarapchak satisfies the first element.   As shown, she enjoys the right to due process at her formal misconduct hearing, which County officials did not afford to her.

Ms. Tarapchak satisfies the second element because she provides sufficient evidence of a custom.   To establish a custom, Ms. Tarapchak must demonstrate "a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law."[145]   Director Lynn has conducted formal misconduct hearings since 2001.[146]   Four other employees of the House Arrest Program also conduct these hearings.[147]   Director Lynn testified he holds several misconduct hearings each week.[148]   In 2014 and 2015, he conducted 102 and 92 misconduct hearings, respectively.[149]   He and his staff conduct hundreds of these hearings each year.[150]   This evidence alone is insufficient to establish an unlawful custom because we have no direct evidence about the substance of these misconduct hearings.

But, Director Lynn swears, "[i]n the case of Stephanie Tarapchak, *as in all cases*, my responsibility is limited to making a determination as to whether the individual has violated the terms of the order establishing the status of home confinement."[151]   Because Director Lynn conducted the preliminary hearing against Ms. Tarapchak despite his lack of impartiality, a

reasonable jury could conclude Director Lynn also performs this function "in all cases."[152]   If true, he deprives due process in all cases.  This process violates the County's policies.  If true, Director Lynn's practices may nevertheless be found to create a custom notwithstanding the County's policies.

In addition to demonstrating a custom, Ms. Tarapchak must show "an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom."[153]   Ms. Tarapchak does not need to specifically identify the official with policymaking authority.[154]  "Practices 'so permanent and well settled' as to have 'the force of law' [are] ascribable to municipal decisionmakers."[155]  Thus, even if a custom or policy "has not been formally approved by an appropriate decisionmaker," it "may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law."[156]  Ms. Tarapchak did not identify the relevant policymaker.  Even so, based on the evidence of the County's practice of conducting formal misconduct hearings and Director Lynn's sworn admission, a jury could reasonably ascribe the practice to the relevant policymaker because Director Lynn's admitted practice of conducting unlawful misconduct hearings "in all cases" is so widespread as to have the force of law.  In other words, the evidence creating a genuine issue of material fact Director Lynn routinely conducted unlawful formal misconduct hearings also gave the County's relevant policymaker constructive notice of the practice so permanently well settled as to have the force of law.

The County's custom described by Director Lynn, if believed, amounts to a deliberate indifference to Ms. Tarapchak's constitutional rights.  "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."[157]  As the County had constructive notice of Director Lynn's

conducting unlawful formal misconduct hearings, a reasonable jury could find the County's refusal to address this custom constituted deliberate indifference to Ms. Tarapchak's constitutional rights.

Ms. Tarapchak also demonstrates the County's custom was the moving force behind her injury. "As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury."[158]  But for the County's failure to address its custom, Ms. Tarapchak would not have undergone Director Lynn's unlawful formal misconduct hearing.

### *Failure to train*

Ms. Tarapchak also demonstrates sufficient evidence for a reasonable jury to conclude the County failed to train Director Lynn. "Establishing municipal liability on a failure to train claim under § 1983 is difficult. A plaintiff pressing a § 1983 claim must identify a failure to provide specific training that has a causal nexus with their injuries."[159]  Ms. Tarapchak also "must demonstrate that the absence of that specific training can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivations occurred."[160]  Ms. Tarapchak must identify "the specific training the [City] should have offered."[161]  "Mere proof that an injury could have been avoided if the municipal officer or employee 'had better or more training is not enough to show municipal liability' under a 'failure to train' *Monell* claim."[162]

Ordinarily, "[a] pattern of similar constitutional violations by untrained employees" is necessary "to demonstrate deliberate indifference for purposes of failure to train."[163]  "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."[164]  "A pattern of violations puts municipal decisionmakers on notice that a new program

is necessary, and '[t]heir continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability.'"[165]

Ms. Tarapchak posits Lackawanna County failed to train Director Lynn:1) to hold constitutional formal misconduct preliminary hearings; 2) timely schedule a bail revocation hearing; and, 3) to distinguish between valid and invalid court orders.

Under her first theory, there is sufficient evidence for a reasonable jury to find the County failed to train Director Lynn on how to lawfully conduct formal misconduct preliminary hearings. Director Lynn admitted the County never trained him. Based on his sworn affidavit, there is a genuine dispute of material fact as to whether Director Lynn regularly conducted hundreds of unlawful misconduct hearings constituting a pattern of violations. This evidence of a pattern of violations would allow a reasonable jury to find the County had constructive notice of Director Lynn's practice yet consciously disregarded the risk Director Lynn would continue violating the constitutional rights of alleged bail condition violators.

Under the second theory, Ms. Tarapchak's failure to train claim must be dismissed because she does not show an underlying constitutional violation concerning the scheduling of a bail revocation hearing. Ms. Tarapchak does not demonstrate Director Lynn's conduct relating to the scheduling of a bail revocation hearing violated the due process requirement of holding a hearing within a reasonable period of time. The Supreme Court in *Morrissey* held a parolee must have a parole revocation hearing within a reasonable period of time, and concluded two months is not unreasonable.[166]   Even assuming Director Lynn is responsible for scheduling Ms. Tarapchak's bail revocation hearing, Director Lynn is not liable because the bail revocation

hearing occurred within a reasonable period of time—15 days.  In other words, the timing of the bail revocation hearing did not violate her due process rights.

Tarapchak's third failure to train theory likewise fails because it is predicated on her claim Director Lynn falsely arrested her, a claim we dismissed.[167]  We concluded Director Lynn enjoys immunity because of his reasonable reliance on a facially valid warrant.[168]   Even assuming Director Lynn unreasonably relied on the warrant, he had probable cause to arrest Tarapchak for violating a bail condition because Tarapchak admitted to doing so.[169]

### *Harm to Ms. Tarapchak.*

Ms. Tarapchak received a hearing before Judge Braxton within fifteen days of her violation.  She declined to proceed claiming he must recuse and the Judge continued the hearing.  She then focused on disqualifying and replacing court appointed defense counsel.

As described in *Morrissey,* waiting for a final revocation hearing for fifteen days would appear to be reasonable.  Neither the County nor Director Lynn control Judge Braxton's calendar.  She elected not to proceed.  As we apply *Morrissey* to find a liberty interest for pre-trial home confinement bailees, we also apply its holding to find the preliminary hearing held in the prison before the final court hearing must also provide some measure of due process.   There are disputed issues whether the County provides this due process in the preliminary hearings if the person charging you with violations is the same person holding your preliminary hearing.    If the jury finds liability against the County, Ms. Tarapchak is entitled, at a minimum, to nominal damages.

## III.   Conclusion

Ms. Tarapchak has a liberty interest in home confinement triggering due process protections, including a preliminary formal misconduct hearing followed by a final bail

revocation hearing held within a reasonable period of time.  There are procedural defects in her formal misconduct preliminary hearing.  Even so, Director Lynn is entitled to qualified immunity and is dismissed.  Based on Director Lynn's admission of uniform conduct not only as to Ms. Tarapchak but "in all cases",  there are genuine issues of material fact as to whether the County had an unlawful de facto custom and failed to train Director Lynn on how to conduct formal misconduct preliminary hearings.

---

[1] On a motion for summary judgment, the court must consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted).

[2] ECF Doc. No. 193-1, at p. 14; ECF Doc. No. 193, at p. 24. After trial, the jury found Ms. Tarapchak guilty of: insurance fraud; theft by deception; corruption; perjury; endangering the welfare of children; drug delivery resulting in death; sale of controlled substances; and, refusal to maintain records. ECF Doc. No. 193-1, pp. 41-42.   Judge Braxton later sentenced her.  We are unaware whether Judge Braxton gave Ms. Tarapchak credit for pre-trial time served in her sentence.

[3] ECF Doc. No. 193, at p. 46.

[4] *Id.* at p. 47–48.

[5] ECF Doc. No. 193, at p. 4.

[6] ECF Doc. No. 193, at p. 13. The record also contains references to the Home Confinement Program.

[7] ECF Doc. No. 193-1, at p. 45.

[8] ECF Doc. No. 193, at p. 13.   The May 5, 2015 Order authorized the issuance of a bench warrant under 61 P.S. § 2141, repealed by the Pennsylvania General Assembly in 2008.

[9] ECF Doc. No. 193, at p. 13.

[10] ECF Doc. No. 201-1, at ¶ 1.

[11] ECF Doc. No. 224, at p. 5.

[12] ECF Doc. No. 201-1, at ¶¶ 3, 5.

[13] *Id.* at ¶¶ 7, 11.

[14] *Id.* at ¶ 9.

[15] ECF Doc. No. 224, at p. 53.

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.* at p. 29.

[23] *Id.* at p. 30.

[24] *Id.* at p. 36.

[25] *Id.* at p. 7.

[26] *Id.* at p. 38.

[27] *Id.* at p. 72.

[28] *Id.*

[29] ECF Doc. No. 201-1, at ¶ 6.

[30] *Id.*

[31] *Id.* at ¶ 10.

[32] ECF Doc. No. 224-1, at p. 5.

[33] ECF Doc. No. 192, at p. 6–7.

[34] *Id.* at 6.

[35] *Id.*

[36] *Id.*

[37] *Id.* at p. 6–7.

[38] ECF Doc. No. 193, at p. 51.

[39] *Id.* at p. 52; ECF Doc. No. 193-1, at p. 7.

[40] ECF Doc. No. 201-1, at ¶ 4.

[41] ECF Doc. No. 201, at p. 16.

[42] ECF Doc. No. 201-1, at ¶ 4.

[43] *Id.*

[44] *Id.* at ¶ 6.

[45] ECF Doc. No. 193, at p. 19.

[46] *Id.* at p. 23.  The motion did not appear on the docket until October 30, 2014.  ECF Doc. No. 193-1, at p. 47.

[47] ECF Doc. No. 201-1, at ¶ 9; ECF Doc. No. 193, at p. 21.

[48] ECF Doc. No. 193, at p. 58.

[49] *Id.*

[50] *Id.* at p. 66.

[51] *Id.* at p. 21.

[52] *Id.*

[53] *Id.*

[54] *Id.* at pp. 31–32.

[55] *Id.* at p. 33.

[56] *Id.* at p. 34.

[57] ECF Doc. No. 193-1, at p. 2.

[58] ECF Doc. No. 1.

[59] ECF Doc. No. 120.

[60] Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On a motion for summary judgment, the court must consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Slagle*, 435 F.3d at 264 (citations omitted). If the movant carries its initial burden of showing the basis of its motion, the burden shifts to the non-moving party to go beyond the pleadings and point to "specific facts showing that a genuine issue exists for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). In other words, the non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Podobnik v. US. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (citation and internal quotation marks omitted). Summary judgment must be granted against a non-moving party who fails to sufficiently "establish the existence of an essential element of its case on which it bears the burden of proof at trial." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).

[61] *Elmore v. Cleary*, 399 F.3d 279, 282 (3d Cir. 2005) (quoting U.S. Const. amend. XIV, § 1).

[62] *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) (quoting *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 168 (1951) (Frankfurter, J., concurring)).

[63] *Id.* at 481 (citing *Fuentes v. Shevin*, 407 U.S. 67 (1972)).

[64] *Id.* at 482.

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] *Id.* at 478.

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] *Id.* at 482.

[73] *Young v. Harper*, 520 U.S. 143, 145 (1997).

[74] *Id.* at 147.

[75] *Id.* at 148.

[76] *Wall v. Dauphin Cty.*, No. 4-0238, 2006 WL 27123, at *4 (M.D. Pa. Jan. 5, 2006).

[77] *Id.*

[78] *Id.* (quoting *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975)).

[79] *Morrissey*, 408 U.S. at 482.

[80] *Id.*

[81] *Id.*

[82] *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

[83] *Id.*

[84] *Sandin v. Conner*, 515 U.S. 472, 486 (1995).

[85] *Id.* at 481.

[86] *Id.* at 482.

[87] *Id.* at 484.

[88] *Id.* at 486.

[89] *Id.* at 484.

[90] *Id.* (quoting *Bell*, 441 U.S. at 535).

[91] *Id.* (quoting *Bell*, 441 U.S. at 539).

[92] *Id.*

[93] *Id.* at 485.

[94] *Betterman v. Montana*, 136 S. Ct. 1609, 1619 (2016) (quoting *Morrissey*, 408 U.S. at 481 (1972)).

[95] *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

[96] *Morrissey*, 408 U.S. at 483.

[97] *Id.* at 482.

[98] *Id.*

[99] *Id.*

[100] *Id.*

[101] *Id.*

[102] *Id.*

[103] *Id.* at 483.

[104] *Id.*

[105] *Id.*

[106] *Id.*

[107] *Id.*

[108] *Id.* at 485.

[109] *Id.*

[110] *Id.* at 485–86.

[111] *Id.* at 485.

[112] *Id.* at 486–87.

[113] *Id.* at 487.

[114] *Id.*

[115] *Id.*

[116] *Id.* at 488.

[117] *Id.*

[118] *Id.*

[119] *Id.* The Court concluded a two-month delay is not unreasonable. *Id.*

[120] *Id.* at 482.

[121] *Id.*

[122] *Id.*

[123] *Gerstein*, 420 U.S. at 126.

[124] *Morrissey*, 408 U.S. at 483.

[125] ECF Doc. No. 224, at p. 53.

[126] *Id.*

[127] ECF Doc. No. 193, at p. 66.

[128] *Id.*

[129] *Morrissey*, 408 U.S. at 486.

[130] *Id.* at 488.

[131] ECF Doc. No. 193, at p. 31–32.

[132] *U.S. v. Wade*, 388 U.S. 218, 227 (1967).

[133] *United States v. A.R.*, 38 F.3d 699, 704 (3d Cir. 1994).

[134] *Wade*, 388 U.S. at 236.

[135] *K.A. ex rel. J.A. v. Abington Heights Sch. Dist.*, 28 F. Supp. 3d 356, 366 (M.D. Pa. 2014).

[136] *Giuffre v. Bissell*, 31 F.3d 1241, 1256 (3d Cir. 1994) (citing *Warren v. City of Lincoln*, 864 F.2d 1436, 1442 (8th Cir. 1989)).

[137] *Id.* (citing *Warren*, 864 F.2d at 1442).

[138] *Berg v. Cty. of Allegheny*, 219 F.3d 261, 272 (3d Cir. 2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[139] *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

[140] *Id.*

[141] *Id.*

[142] *Id.*

[143] *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978); *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).

[144] *Vargas v. City of Philadelphia*, 783 F.3d 962, 974 (3d Cir. 2015) (quoting *City of Canton*, 489 U.S. at 389–91) (brackets omitted).

[145] *Watson v. Abington Twp.*, 478 F.3d 144, 155–56 (3d Cir. 2007) (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 849 (3d Cir. 1990)).

[146] *Id.* at p. 29.

[147] *Id.* at p. 30.

[148] *Id.* at p. 36.

[149] *Id.* at p. 7.

[150] *Id.* at p. 38.

[151] ECF Doc. No. 201-1, at p. 6 (emphasis added).

[152] *Id.*

[153] *Watson*, 478 F.3d at 155–56 (quoting *Bielevicz*, 915 F.2d at 854).

[154] *Bielevicz*, 915 F.2d at 850.

[155] *Id.* (quoting *Anela v. City of Wildwood,* 790 F.2d 1063, 1067 (3d Cir. 1986)).

[156] *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).

[157] *Bryan Cty.*, 520 U.S. at 410.

[158] *Bielevicz*, 915 F.2d at 851.

[159] *Reitz v. Cty. of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997) (citing *Colburn v. Upper Darby Township*, 946 F.2d 1017, 1030 (3d Cir. 1991)).

[160] *Id.* (citing *Colburn*, 946 F.2d at 1030).

[161] *Id.*

[162] *White v. Brommer*, 747 F. Supp. 2d 447, 463 n.42 (E.D. Pa. 2010) (quoting *Kline ex rel. Arndt v. Mansfield*, 255 F. App'x 624, 629 (3d Cir. 2007)); *see also City of Canton*, 489 U.S. at 391 ("Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.").

[163] *Thomas v. Cumberland Cty.*, 749 F.3d 217, 223 (3d Cir. 2014) (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)).

[164] *Id.* (quoting *Connick*, 563 U.S. at 62).

[165] *Thomas*, 749 F.3d at 223 (quoting *Bryan Cnty.*, 520 U.S. at 407).

[166] *Morrissey*, 408 U.S. at 488.

[167] ECF Doc. No. 118, at p. 29.

[168] *Id.*

[169] ECF Doc. No. 193-1, at p. 7.